**UNITED STATES of America**

v.

**Benjamin G. SPRECHER, Defendant.**

**No. S3 90 Cr. 234 (MGC).**

United States District Court,
S.D. New York.

Jan. 16, 1992.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. by John W. Auchincloss II, Andrew E. Tomback, Asst. U.S. Attys., New York City, for U.S.

Ivan Stephan Fisher, Kenneth M. Tuccillo and David W. Ely, New York City, for defendant.

## OPINION AND VERDICT

CEDARBAUM, District Judge.

This case arises out of defendant Benjamin G. Sprecher's relationship to certain corporate shells and his control of a tax-exempt religious corporation. Sprecher, an attorney with a securities law practice in New York City, is charged with conspiring to defraud the United States and making false statements to a government agency in connection with two separate securities

transactions, one involving Towers Financial Corporation and the other, World Wide Medical Technology. He is also charged with perjury and obstruction of justice in connection with an SEC investigation, and with obstruction of justice in a lawsuit he filed in federal district court in Utah.[1] With the consent of the Government, Sprecher waived a jury trial under Fed. R.Crim.P. 23(c).

At the beginning of the trial, Sprecher stipulated that at all times relevant to the indictment, he controlled Kahila Kadeshia Parkofski ("KKP"), a New York religious corporation that was granted exemption from federal income tax by the Internal Revenue Service ("IRS") pursuant to 26 U.S.C. § 501(c)(3). KKP was a recipient of funds in the Towers transaction and stock in the World Wide deal, and was the subject of SEC investigations leading to the perjury and obstruction of justice counts of the indictment. Sprecher also stipulated that he had more than an attorney-client relationship with NAV–AIR, another corporation involved in one of the obstruction of justice charges, and that witnesses would testify that he has controlled NAV–AIR since 1986. Finally, Sprecher and the Government agreed during the trial that the testimony of Charles Kahn at a pretrial bail hearing held on October 4, 1991 would be received in evidence as if Kahn had so testified at trial.

After a thirteen-day bench trial at which the Government presented fourteen witnesses and many documents and the defendant presented three witnesses and a number of documents, and after evaluating the credibility of all the witnesses and weighing the evidence, I find beyond a reasonable doubt as follows.

## THE FACTS

Sprecher is an attorney who has represented various individuals and participated himself in a number of transactions involving small issuer stocks. From the mid–1980's, he maintained an office for the

practice of law within a suite at 350 Broadway in New York City. Prior to that time, his office suite was located at 11 Park Place. In both locations, Sprecher sublet some of the office space within the suite to other attorneys and business people, some of whom were associated with him in his law practice and some of whom transacted business with him.

### A. Kahila Kadeshia Parkofski ("KKP")

In January 1979, Sprecher incorporated KKP as a New York religious corporation. According to its certificate of incorporation, KKP was established for the purpose of maintaining a place for religious worship in accordance with Orthodox Jewish traditions, that is, as a synagogue. The KKP certificate lists Sprecher as rabbi, presiding officer, and a subscriber and trustee of the organization, and states that the "principle [sic] place of worship" will be at 138–49 77th Avenue, Flushing, New York—Sprecher's home. (GX 101A.)

At the end of 1980, Sprecher applied to the IRS for tax-exempt status for KKP. The application was approved in January 1981, and KKP was assigned tax identification number ("TIN") 11–2549681.

The address for KKP was changed sometime in the early 1980's to 187 Hooper Street, Brooklyn, New York. Jacob I. Levine, an SEC investigator, testified credibly, however, that when he visited 187 Hooper Street in the spring of 1986 he found it to be a Hasidic elementary school, and did not observe any signs of KKP activity at that address.

### 1. KKP bank accounts and monies

KKP has had at least four bank accounts in the United States. Signature cards for two accounts opened at Atlantic Bank in New York in 1978 and 1983 and for a third account opened at Nassau Federal Bank in New York in 1984 identify Sprecher as president and a signatory of KKP. The signature card for a fourth KKP account opened at Citibank in New York in 1985 lists Sprecher as attorney and a signatory.

A schedule of disbursements from these KKP bank accounts for the years 1983 through 1989 shows that many checks

---

**1.** Shortly before trial, counts eight and twelve of the twelve-count indictment were dismissed by the court and withdrawn by the Government, respectively. The Government has also withdrawn the Rule 10b–5 allegations brought under 15 U.S.C. §§ 78j(b) and 78ff in count three.

drawn on KKP during that period were payable to Sprecher or his wife, Victoria, who was also a signatory of all but the Nassau Federal account. Other KKP checks were made out to cash, to Sprecher employees, to securities brokers, to pay credit card and gambling expenses, and to individuals and entities apparently otherwise unconnected with KKP. Contributions by KKP to religious or charitable causes comprise less than ten percent of the disbursements listed in the schedule.

In addition to the accounts in the United States, KKP maintained a bank account at Bank Leumi in Jerusalem, Israel.[2] Bank Leumi produced copies of account opening documents for KKP, including two corporate resolution forms that are blank except for the signatures of Benjamin and Victoria Sprecher, as well as monthly account statements for the years 1989 and 1990. The bank also had KKP's certificate of incorporation and a copy of its tax-exempt status letter from the IRS.

The KKP account in Jerusalem was opened in September 1987. The documents submitted to Bank Leumi show Benjamin Sprecher as the director and secretary of KKP, and list 187 Hooper Street in Brooklyn as KKP's address. Benjamin Sprecher and Victoria Sprecher are the only names that appear on any of the documents executed in connection with the opening of the Bank Leumi account. There is no indication in the Bank Leumi papers that KKP had a presence in Israel distinct from the New York corporation, or indeed that KKP was related in any way to an Israeli entity.

*2. Sprecher's purchase and sale of securities in the name of KKP*

In addition to its bank accounts, KKP has maintained securities trading accounts at Datek Securities ("Datek"), Network One, Monarch Funding, and Western Capital Securities. It was Sprecher who dealt with the brokers and controlled each of these accounts.

An account card produced by Datek shows that Sprecher opened the trading account for KKP. The card lists KKP as a

"citizen" of Israel, but also has the KKP TIN as the social security number for the account. Other records for KKP's Datek account indicate that that account was active from at least December 1982 through November 1985. During that period, checks totaling almost $945,000 were issued by Datek to KKP.

Caryl Bernard, who was a credible and forthcoming witness, testified about opening trading accounts for both KKP and Sprecher while she was employed at Network One in Las Vegas in 1989. Network One marketed securities through a cable television show that aired in California. The KKP and Sprecher accounts were established for the purpose of marketing, through that television program, shares of Greater Bancshares, a shell corporation controlled by Sprecher. Bernard testified that after the program aired, Sprecher called her on more than one occasion to inquire about the success of the promotional effort, and that all of her dealings in connection with the KKP account at Network One were with Sprecher.

*B. NAV–AIR*

NAV–AIR Industries Ltd. ("NAV–AIR") is a Utah corporation that was the product of a 1986 merger between MTM Enterprises ("MTM"), a Utah corporation owned by Sprecher, and Navair Manufacturing and Research, Inc. ("Navair Manufacturing"), a New York corporation. Sprecher had purchased MTM (as well as a number of other corporate shells) from Robert Lund.[3]

A private placement memorandum dated November 6, 1986 lists Joseph Washenko as president, Charles Kahn as vice-president, and E. Frederick Petersen III as secretary/treasurer of NAV–AIR. As was stipulated by the defendant, however, it was Sprecher who actually controlled NAV–AIR at the time. Washenko, with whom Sprecher had negotiated the purchase of Navair Manufacturing, was unaware that his name was listed in the private placement memorandum; as of the

---

**2.** Sprecher's efforts to prevent Bank Leumi from supplying the KKP account records in response to a Government subpoena are detailed below.

**3.** The schedule of KKP disbursements discussed above shows checks payable to Lund totaling in excess of $100,000, representing payments for shell corporations.

time of the merger, he no longer considered himself to be president of the company. Although Charles Kahn may have been aware of his title of vice-president of NAV–AIR, he did nothing or virtually nothing in connection with that office.

A schedule of disbursements for the NAV–AIR bank account at Citibank similar to that prepared by the Government for the KKP bank accounts indicates that checks drawn on the account were made out to Sprecher and his wife, to Sprecher employees, to cash, to pay credit card expenses, and to KKP. Like KKP, NAV–AIR maintained a bank account at the Jerusalem branch of Bank Leumi, which was also opened in September 1987. Benjamin and Victoria Sprecher are listed in the account opening documents as the only signatories of this NAV–AIR account; the address given for NAV–AIR is Sprecher's office at 350 Broadway.

NAV–AIR also maintained a securities trading account at Western Capital Securities ("Western Capital"). According to a statement of the NAV–AIR account at Western Capital, World Wide Medical stock was deposited into and sold out of this account in the latter half of 1988.

### C. The Towers Conspiracy—Counts One and Two

Counts one and two of the indictment arise out of the sale of shares of the Towers Financial Corporation as part of a settlement entered into between Towers and Louis Foti, a business associate and client of Sprecher's with whom the Government contends Sprecher and his law partner G. Alexander Novak conspired to mislead the IRS. Foti, who cooperated in the Government's investigation of Sprecher, testified at trial as a prosecution witness. Count one charges Sprecher under 18 U.S.C. § 371 with conspiring to defraud the United States and the IRS and with conspiring to violate 18 U.S.C. § 1001 by making a false statement within the jurisdiction of the IRS. Count two charges Sprecher with making a false statement within the jurisdiction of the IRS in violation of 18 U.S.C. §§ 2 and 1001.

### 1. The Foti–Towers litigation

In 1986, Foti controlled a corporate shell known as O.G. Consulting, Inc. ("O.G.") through stock held by his nominees. In June of 1986, with Sprecher acting as attorney for O.G., Foti sold most of O.G.'s stock to a private company, Professional Business Brokers, Inc. ("Professional Business Brokers") and the resulting entity became Towers Financial Corporation ("Towers"). Under the terms of the merger, each share of O.G. was converted into a share of Towers. Foti, through his nominees, retained shares of the new corporation.

Sprecher wrote a letter on June 3, 1986 to Professional Business Brokers in connection with the Towers–O.G. merger regarding the Towers shares that remained under Foti's control (the "Foti shares") agreeing that three Foti nominees would sell no more than 1,000 shares of Towers stock per month in the open market for a period of one year, and no more than 750 shares a month thereafter (the "lock-up agreement"). To ensure compliance with the lock-up agreement, Towers took physical possession of these Foti shares.

In late 1988, Foti sued Towers to enforce a settlement agreement signed in 1987 (the "1987 settlement agreement") that had ended a dispute between Foti and Towers concerning the rights to the Foti shares after Foti had surreptitiously sold some of those shares by having a duplicate stock certificate issued to his brother by a stock transfer agent (since Towers had possession of the original certificate). Novak, under Sprecher's direction, commenced the 1988 litigation in state court on behalf of Foti; in 1989, a law firm acting on behalf of Towers initiated a related suit in federal court.

In mid-November 1989, Novak received what he considered to be a very favorable settlement offer from Towers, and proceeded to negotiate a settlement with Towers based on that offer (the "1989 settlement agreement").

### 2. The tax fund

Under the 1989 settlement agreement reached between Foti and Towers, the 441,-000 Foti shares that remained in Towers

possession were to be sold through brokers on an expedited basis. Some of the proceeds of the sale were to go to Towers; the remainder were to go either to Foti or to pay Foti's tax liability resulting from the sale. Under the agreement, an escrow account was to be established by Foti's attorneys for the benefit of Foti. A stated purpose of this account was to make funds available to pay the taxes owed by Foti. The amount to be held in escrow for tax purposes, 39.5% of all sums in excess of $346,650 realized from the sale of the Foti shares (the "tax fund"), was based on the parties' estimate of Foti's maximum tax liability. Any amount remaining in the tax fund after the satisfaction of all of Foti's tax liabilities was to be paid over to Foti.

During early December 1989, Novak researched the tax consequences of the settlement agreement and concluded that Foti's tax exposure would be significantly less than that contemplated by the settlement agreement. It seemed to Novak that Foti would not face tax liability on the funds that were earmarked for Towers. Novak discussed his research with Sprecher prior to the signing of the 1989 settlement agreement (the "closing"), and Sprecher discussed it with Foti. As Novak testified: "Dr. Sprecher then told me the following of the tax fund whatever it would be, and at that time we were estimating it to be approximately $800,000, 50 percent would go to Foti, 25 percent would go to me as a bonus for doing such a smart bangup job in this case, and 25 percent would go to KKP." (Tr. at 1674.) Novak testified that in another conversation, Foti remarked to Novak that Novak was getting a lot of money, and that Sprecher was being quite generous with Novak. There was a clear understanding among Sprecher, Novak, and Foti as to the division of the tax fund.

Novak and Sprecher also agreed prior to the closing that the tax fund would first be deposited into Novak's law firm escrow account. A check payable to KKP would later be drawn on the escrow account, and Sprecher would take that check to Israel where it would be deposited into KKP's Jerusalem bank account.

### 3. Use of the KKP TIN

Shortly before the closing, Novak mentioned to Sprecher that he anticipated that there would be a request at the closing for the tax identification number for the recipient of the tax fund. Sprecher, who was not to be at the meeting, instructed Novak to use the TIN belonging to KKP at the closing and supplied Novak with that number on a piece of paper. Novak carried the piece of paper with him to the closing. He also took along the TIN for his law firm as a "fallback position," that is, in case someone challenged the use of the KKP TIN. (Tr. at 1743.)

At the closing, which took place on December 15, 1989, Mitchell Brader, a Towers employee, telephoned M.H. Meyerson & Co., Inc. ("Meyerson"), a brokerage firm, to tell Meyerson that the contracts had been signed and that the Foti shares could be sold. Brader instructed Meyerson to title the brokerage account according to the terms of the settlement agreement, that is, "Novak, Novak & Sprecher as Attorneys for Louis Foti" (the "NNS account").[4] Novak was then asked by Brader what the TIN for the account should be and he responded by giving the KKP number. Michael Rosoff, who represented Towers at the closing, testified credibly that, at the meeting, he heard Novak give an employer identification number—which Rosoff recognized as such because it began with two digits followed by a hyphen—as the TIN for the transaction, rather than an individual's social security number. Novak did not explicitly state to Brader that the KKP TIN was the TIN for the NNS account. But in responding as he did, it is clear that Novak intended to give and did give the false impression that the KKP

---

**4.** The second Novak is G. Alexander Novak's wife, Rebecca A. Novak, who practiced law with her husband as Novak & Novak.

Although the 1989 settlement agreement contemplated that the escrow account into which the tax fund would be deposited would be that of Novak, Novak & Sprecher, as escrow agent for Louis Foti, the monies were actually deposited into the two Novaks' law firm escrow account, which was titled "Novak & Novak."

TIN was the appropriate TIN for the transaction, in accordance with his agreement and plan with Sprecher.

That Novak gave the KKP TIN at the closing is further evidenced by the fact that that number appears on brokerage documents created in connection with the sale of the Foti shares. These include the account opening form of Meyerson and the forms of Ernst & Co. ("Ernst"), the clearing broker to which Meyerson referred the transaction.

### 4. Transport of funds to Israel and their laundering through KKP

Novak eventually received checks amounting to some $2 million representing the proceeds of the Towers stock sales, which he deposited into his law firm escrow account. On January 17, Novak drew a check on that account for $760,000, representing the tax fund, and gave the check to Sprecher to transport to Israel and to deposit into the KKP account there.

Shortly thereafter, Sprecher carried this check to Israel and deposited it into the KKP account at Bank Leumi in Jerusalem. During this trip, Sprecher also opened two corporate accounts at Bank Leumi, S.J. Ventures and Jakarta Ventures, on behalf of Novak and Foti, respectively, using documents he had prepared with Novak and Foti after the Towers closing and prior to leaving for Israel.

That Sprecher carried the tax fund to Israel, deposited the money in the KKP account, and thereafter withdrew from the KKP account Novak and Foti's shares of the fund and deposited those sums into the S.J. Ventures and Jakarta Ventures accounts is further evidence of the plan that existed among Sprecher, Novak and Foti to divide the tax fund among themselves and to use the KKP TIN to misrepresent to the IRS the identity and tax status of the true beneficiaries of the fund.

### 5. Novak's participation in the conspiracy

Sprecher argues that he could not have conspired with Novak to give a false TIN at the Towers closing because Novak believed that the KKP TIN was an appropriate TIN to supply for the transaction since Sprecher had told him that KKP was entitled to some portion of the proceeds. In support of this argument, Sprecher points to the 1986 lock-up agreement, which provides in part:

These three individuals, pursuant to your concern, have agreed not to sell in the open market more than 1000 shares a month of Towers Financial corporation, par value .0005 for one year from the date of this letter and thereafter no more than 750 shares, up to a total of 50,000 shares.

This agreement in no way prevents the individuals from donating the balance of these shares, or selling such shares in a private transaction.

As you are aware, these individuals have already agreed to sell and/or donate such shares and the new owners of the shares will be purchasing unlegended shares and therefore may sell these shares.

In the event that you desire to make arrangements with such individuals or the charitable institution, I shall be more than happy to provide you the names of such individuals and/or charitable institutions and you may make any arrangements that you desire with them.

(GX 404.)

The evidence does not support Sprecher's contention, however. KKP is not mentioned by name in the lock-up agreement or either of the settlement agreements, and the vague reference to a charitable institution in the lock-up agreement is of no significance since the lock-up agreement was specifically rendered null and void upon the execution of the 1989 settlement. I believe the testimony of Rosoff, Towers' attorney at the closing, that he had never heard of KKP or a KKP interest in the Foti shares prior to or at the time of the closing. Novak himself did not testify to having a clear understanding of such an arrangement, but rather that it was "kind of a slippery thing." (Tr. at 1723.) In any event, Sprecher and Novak agreed prior to the closing that Foti, Novak, and Sprecher—for whom KKP was an alter ego—would be the ultimate beneficiaries of the tax fund.

Sprecher also points to Novak's testimony that on two occasions, when Novak approached him to say that he needed more money from Foti in order to continue the Towers litigation effort, Sprecher responded by telling Novak not to worry, that KKP had an interest in the stocks that were the subject of the lawsuit. Novak also testified, however, that in spite of what Sprecher said about KKP's interest in the Foti shares, Foti never made it clear to Novak that he intended to donate stock to KKP. As Novak put it: "Foti wasn't clear.... I was always confused exactly how much stock was supposed to go to whom, KKP or whatever. So that was never pinned down." (Tr. at 1650–51.)[5]

As a defense witness, Novak testified that he felt "comfortable" in giving the KKP TIN at the closing "because my understanding of—my understanding was that by giving the—I had some basis that I thought, based on the [lock-up agreement] that says there was delivery of the stock,[6] share certificates, from Foti to Sprecher, and Sprecher telling me that he took them for KKP." (Tr. at 1680–81.) The defense made much of Novak's "comfort" at trial, but I do not. Although I found Novak in certain respects to be a forthcoming and credible witness, on this point his demeanor, combined with the hesitating quality of his testimony, showed that he did not believe that KKP was the actual beneficiary of the tax fund or that KKP's TIN was a legitimate TIN to attach to the transaction. I accept as true Novak's more credible testimony about his understanding of the agreement with Sprecher and Foti, which directly contradicted his halting and confused attempt at justification: "[T]he KKP number would go in the black hole and out of that Foti would get his 50 percent, and I

would get 25 percent, and [the] IRS would have a difficult time tracking what happened in a foreign country." (Tr. at 1682.)[7]

### D. The World Wide Conspiracy—Counts Three, Four, Five, Six, and Seven

Counts three through seven of the indictment relate to a plan conceived by Sprecher and others to merge World Wide Medical Technology ("World Wide"), a shell corporation without significant assets or operations, with a private company so that unregistered shares of World Wide stock could be sold illegally to the public for the benefit of Sprecher and his coconspirators (the "World Wide conspiracy"). Count three charges Sprecher under 18 U.S.C. § 371 with conspiring with others to sell unregistered securities in the market in violation of 15 U.S.C. §§ 77e and 77x and to violate 18 U.S.C. § 1001 by making false statements in a matter within the jurisdiction of the SEC. Counts four through seven charge Sprecher with violating 18 U.S.C. §§ 2 and 1001 by making false statements in four different documents filed with the SEC.

#### 1. World Wide

World Wide was incorporated in Nevada in 1982, and thirty-nine million shares of World Wide stock were offered for sale to the public in 1983. The 1983 registration statement lists Sprecher as World Wide's attorney and Sprecher's 11 Park Place address as the corporations's principal executive offices and place of business.

World Wide declared a 1,000–for–one reverse stock split on April 4, 1984, reducing the number of World Wide shares held by the public to 39,000. On the same day as the reverse stock split, World Wide reduced the total number of shares authorized to be

---

**5.** Although Novak testified that he thought of KKP as a legitimate charity and therefore donated one-tenth of his portion of the Towers funds, or $20,000, to it, other testimony he gave in which he invoked Sprecher and KKP interchangeably suggests that Novak in fact considered KKP to be an alter ego for Sprecher: "[Sprecher] said he had a large interest in these [Towers] stocks. Or KKP had a large interest in these stocks." (Tr. at 1643.)

In any event, whether Novak understood KKP as having a legitimate charitable function is

unimportant because he also understood, prior to the Towers closing, that it was being used for illicit ends.

**6.** It should be noted that the lock-up agreement does not mention delivery of stock.

**7.** In his testimony, Novak admitted that he had pleaded guilty to this conspiracy to defraud the IRS.

issued from 200 million to 50 million, and 3.5 million shares were issued to Jacob ("J.R.") Roth, a business associate and client of Sprecher's. Thus Roth came to own 97% of the issued shares of World Wide in his own name. He also controlled several thousand shares through nominees. Following the stock split, Sprecher himself owned 1,500 shares of World Wide.

The original officers of World Wide were Herman Freund, Aharon Markovitz, and Abraham Markovitz. Freund, who was listed as World Wide's president, testified that he never attended a World Wide meeting or received physical possession of the one million World Wide shares that the 1983 prospectus records as having been issued to him. Roth routinely sent various World Wide documents by messenger to Freund for his signature; Freund signed them without studying their contents. On at least one occasion, Freund signed a blank sheet of writing paper and sent it back to Roth. The Markovitzes, too, were figurehead officers and Roth nominees. In April 1987, Roth replaced Aharon Markovitz as the third director of World Wide.

In early 1988, Foti and a friend of Foti's, John J. "Jay" Hastings III, were seeking to effect a merger between a corporate shell and a private company. They approached Sprecher, who recommended World Wide as a "very good" shell since few of its shares were in the hands of the public, and its SEC filings were up to date. (Tr. at 395.) The three agreed that Foti and Hastings would pay, through Sprecher, a total of $20,000 to Roth for World Wide, and that Sprecher, Foti, and Hastings would each thereby acquire a one-third interest in the shell.

Since Roth's World Wide stock was unregistered, in order to sell it in the market at a profit as soon as the contemplated merger went through, the stock had to be exempt from the registration requirements of the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa (the "1933 Act"). Roth had held the stock for more than three years, which rendered it potentially eligible to be "freed up," that is, declared exempt from registration, if the conditions described in Rule 144(k) promulgated under the 1933 Act were met. As Sprecher, Foti, and Hastings understood it, the Rule 144(k) exemption would appear to be satisfied if at least three months before the sale of Roth's shares to the public, World Wide corporate documents were to show that Roth was no longer a control person.

Since they were eager to consummate a merger, Sprecher, Foti, and Hastings decided to meet at Sprecher's office on March 30, 1988 (the "March 30 meeting") to "elect" new officers and directors of World Wide retroactively, and to create and backdate false minutes of a board of directors meeting. Foti testified credibly that both Sprecher and Hastings remarked to him prior to the March 30 meeting that the change in the directorship of World Wide "would have to be three months earlier in order so the stock could be freed up." (Tr. at 400.) Sprecher, Foti, and Hastings thus shared an understanding that the creation of false backdated minutes was an essential step in ostensibly validating the sale to the public of unregistered insider stock of World Wide.

### 2. March 30 meeting

The March 30 meeting in Sprecher's office was recorded on a NAGRA tape (the "March 30 tape") made through the use of a body wire worn by Foti. The tape is compelling evidence of the existence of a conspiracy among Sprecher, Foti, and Hastings to sell unregistered World Wide stock in the market through the falsification of corporate records. On the March 30 tape, the three engage in a discussion of various merger possibilities. Sprecher dominates this conversation, at times alluding to his superior expertise in such matters. In the course of the discussion, Sprecher expresses his disapproval of a proposed transaction between World Wide and Mark Engler, an associate of Hastings. He also brags that he conceived of the 1984 1,000–for–one reverse stock split which resulted in so few World Wide shares in the hands of the public.

Anticipating that some deal would go through shortly, however, Sprecher explains to Foti and Hastings:

Okay, now, here's the situation as it goes. Gentlemen, this is the first thing that we do. Okay? I need the following out of you and let's sit down and—and do this over here. I need a board of the—a meeting of the board of directors, okay? And I will do that, okay? My question over here is, therefore, is who are you putting down as the directors and officers?

(GX 330T at 36–37.) Hastings first mentions "Vince"; laughter follows, and "Vince" is rejected. Hastings next suggests as the new board of directors and officers of World Wide, himself, his mother, Kathleen Gephart, and his sister, Holly Reed.

Later in the meeting, Sprecher requests $20,000 from Hastings to pay Roth for the World Wide shell. Rather than have Hastings write Sprecher a check—since Hastings is connected with the transaction—it is decided that Hastings' mother will write the check, and that "Young Jimmy" Bullard will therefore be used in place of Hastings' mother as the third World Wide officer.

Next, Sprecher, Foti, and Hastings plan the division of the shares held by Roth. It is decided that Roth will retain some of these shares, and that Sprecher, Foti, and Hastings will receive 34%, 33%, and 33%, respectively, of the remaining shares. Sprecher explains that he is entitled to an extra one percent because he is "more instrumental in the thing." (GX 330T at 69.)

Finally, during the last part of the March 30 tape, Sprecher dictates the minutes for a special World Wide board of directors meeting to his secretary, Anna Tokarski. Sprecher instructs "Anna" to date the minutes December 15, 1987.

*3. The December 15 minutes and resignations*

The minutes dictated by Sprecher at the March 30 meeting (the "December 15 minutes") purport to record a meeting held on December 15, 1987 between 5:00 and 6:50 p.m. at which all World Wide officers and directors were present. According to the minutes, at this meeting, Roth and the other World Wide officers and directors unani-mously "elected" Hastings, Reed, and Bullard as their successors after Freund had elicited "a brief background" of the three individuals who had agreed to take over the leadership of World Wide. (GX 304.)

Despite their ostensible participation in this "meeting," Roth, Freund, and Abraham Markovitz somewhat incongruously executed resignations from their official positions that purported to be effective as of 2:00 p.m. on that same day.

*4. The December 16 minutes*

Also in evidence are minutes purporting to record a special World Wide board of directors meeting that took place on December 16, 1987 (the "December 16 minutes"). There is no NAGRA recording of the creation of the December 16 minutes. The December 16 minutes, however, which contain certain typographical errors identical to those in the December 15 minutes, are clearly based upon the December 15 minutes.

In the December 16 minutes, which are signed by Reed as secretary of World Wide, Hastings is supposedly awarded 46,-377,000 newly issued shares of World Wide as consideration for his services as president. Beyond a reasonable doubt, the December 16 minutes were created after the December 15 minutes, that is, on or after March 30, 1988, since they purport to record a meeting of the new World Wide officers who were "elected" at the March 30 meeting in Sprecher's office.

*5. Sham nature of the minutes and resignations*

Sprecher argues that although the December 15 and 16 minutes may not be accurate in every particular, they do reflect actual events that occurred in December 1987 but which Sprecher did not prepare minutes of until a few months later.

Hastings testified that no such meetings took place. Freund, a participant in the December 15 meeting according to the minutes, testified that he never attended such a meeting. Furthermore, the March 30 tape is entirely inconsistent with a real change of directors having taken place in December of the previous year. Rather, on

the tape, Hastings is casting about for some names to use for the new board of directors and officers that will appear in the minutes which Sprecher is about to dictate.

It was further established through the testimony of Hastings that Reed and Bullard, who were "elected" as officers and directors in the December 15 minutes, never actually performed these functions for World Wide. Bullard testified credibly that he was unaware of his election to the post of vice-president and never authorized anyone to say that he had attended a World Wide board of directors meeting on December 16, 1987.

With regard to the resignations, Freund did testify that he specifically remembered resigning from the presidency of World Wide before Hanukkah, but I do not believe this portion of Freund's testimony. This immunized witness' demeanor and guarded and reluctant responses to questions, as well as his inability to remember dates or places, were in marked contrast to his eager and specific recollection of this one particular event. I find that the December 15, 1987 dates appearing in the one-sentence resignations signed by Freund, Roth, and Markovitz were, like the minutes, deliberately backdated. There would have been no basis for Freund and the others to have tendered their resignations in the absence of the December 15 "meeting," and that event and the minutes recording it were fabricated on March 30, 1988.

In further support of his position, Sprecher offered in evidence several excerpts of telephone conversations taped by Foti. These tapes were received for the limited purpose of impeaching Foti's credibility. Some of these are conversations between Foti and Sprecher; the others are conversations between Foti and Hastings. Each occurred after Foti agreed to cooperate with the Government in February 1988, although their precise dates were not established.

In the excerpts of the telephone conversations with Sprecher, Foti presses Sprecher on a number of occasions as to when the World Wide change of control took place, and Sprecher insists that the transaction was finalized in December 1987. Foti's conversations with Hastings are along similar lines, except that Hastings, while urging as "a matter of record" that a meeting took place in December, (DX T–27–6A), at times alludes to the fact that the minutes were drafted later. Hastings testified convincingly that there was no serious discussion about a change of control for World Wide until at least February 1988.

These conversations were not offered for the truth of their contents, but only for the purpose of challenging Foti's credibility. But even if the contents of these telephone conversations are considered for their truth, I do not find these excerpts to be at odds with the purposeful backdating of the minutes. Instead I find that Sprecher's statements were an attempt to preserve the fiction that he and his coconspirators had created and to persuade Foti that he should stick to the story as it appeared in the falsified documents.

Finally, Sprecher points to a canceled check dated January 19, 1988 in the amount of $28.49 written on the World Wide account by Roth which carries the notation "for closing this acc[ount]." (DX X.) Apparently, defendant's argument is that this check somehow supports his contention that Roth gave up control of World Wide in December of 1987. There was no other evidence to shed light on the significance of this check, which could have been written for any number of reasons, and in any event postdates the supposed December change of control. Defendant's contention about the check is pure speculation.

In sum, I find beyond a reasonable doubt that both the December 15 and December 16 "meetings" and minutes are fabrications that were created to facilitate the conspirators' scheme of selling unregistered World Wide stock illegally in the market.

*6. April 21 letter and accompanying filings*

The December 15 minutes and an SEC Form 8–K for World Wide dated December 16, 1987 (the "December 16 8–K") were sent to the SEC by Federal Express under

cover of a letter dated April 21, 1988 (the "April 21 letter"), and were received by the SEC on April 22. The April 21 letter, on Sprecher's letterhead, states that the enclosures had previously been mailed to the SEC on December 21, 1987, but had been returned to Sprecher because the label on the envelope "got torn in the mail." (GX 308.) The April 21 letter constitutes a false statement since the documents enclosed were not created until the spring of 1988.

The December 16 Form 8–K enclosed with the April 21 letter purports to report a change in the control of World Wide resulting from the issuance of 46,377,000 shares of stock to Hastings at a December 16, 1987 board of directors meeting and as reflected in the December 15 minutes, which are incorporated into the 8–K. The Form 8–K includes a signature page dated December 20, 1987 and signed by Reed and Hastings. I find, for the same reasons outlined above with respect to the December 15 and 16 minutes, that the December 16 Form 8–K contains false statements and that the signatures on it are falsely backdated.

I further find that Sprecher caused the April 21 letter, the December 16 Form 8–K, and the December 15 minutes to be sent to the SEC. (There is no evidence that the December 16 minutes were sent to the SEC.) Hastings testified that Sprecher prepared and either mailed or delivered all of World Wide's SEC filings. Furthermore, Thomas Doonan, an investigator for the United States Attorney's Office who executed the warrant for Sprecher's arrest, testified in a highly credible fashion about statements volunteered by Sprecher in which Sprecher admitted creating and filing an 8–K and 10–Q for World Wide. At the time, Sprecher had not been told that his meetings with Foti and Hastings had been recorded, and he was responding aloud to a copy of the indictment he had in his hand. According to Doonan, Sprecher, in the course of this monologue, said that "he was only acting as a lawyer when he filed the 8–K and 10–Q, in putting this information on the 8–K and 10–Q and submitting it to the SEC." (Tr. at 1235.)

During the defense case, it was stipulated that defendant's handwriting expert would testify, if called as a witness, that the April 21 letter was not actually signed by Sprecher. In addition, Sprecher argues that the typist's initials "mm" appearing on the bottom left corner of the letter could not be accurate because they refer to Marlene Mejias, Sprecher's office manager at the time, who testified that she never used the word processor and rarely typed anything herself. In an incredible feat of memory, Mejias also testified that she recalled seeing Hastings and Foti at a word processor together at 6 o'clock one evening "sometime in '88." (Tr. at 1626.) From this, Sprecher speculates that Foti and Hastings forged the April 21 letter and sent it and the accompanying documents to the SEC.

A notation on a check drawn on Sprecher's attorney-at-law account to Lorjon Personnel, Ltd., however, shows that in May 1988, Sprecher paid a $1,000 fee to that agency in connection with an officer worker other than Mejias who had the initials "M.M." Furthermore, Edward Grushko testified credibly as a rebuttal witness that Sprecher often had other people in the office sign his routine correspondence so letters could be sent out at times when he was not available to sign them. Finally, the explanation given in the April 21 letter for the lateness of the enclosed filings—that they had previously been sent but the label had gotten torn—is strikingly similar to the content of another letter about the same purported meetings of the previous December that was sent by Sprecher to World Wide's stock transfer agent, Jersey Transfer and Trust Co. ("Jersey Transfer"). In this Jersey Transfer letter, which is discussed further below, Sprecher requests that 46,377,000 shares of stock be issued to Hastings in accordance with the December 16 minutes that are enclosed, explaining that "it should be noted that I am at fault in the delay in sending you this material. Due to an inadvertence on [my] part, I believed that a copy was sent to you." (GX 312A.) The similarity of the language and purpose of the two letters

supports the other evidence that they were both composed by the same person.

All of the credible evidence establishes beyond a reasonable doubt that the defendant was the author of the April 21 letter and the accompanying SEC filings. Although he may not have penned the signature himself, it was Sprecher who caused the letter and its enclosures to be sent to the SEC.

### 7. May 6, May 31, and other meetings

From February through May 1988, Sprecher met with Foti and Hastings on a regular basis to plan the World Wide merger. Sprecher was also in communication with Roth, as evidenced by the fact that he represented Roth in the negotiations with Foti and Hastings, and had Roth sign the backdated resignation that related to the December 15 minutes. Hastings testified that he saw Roth in Sprecher's office sometime during the period in question.

Two of the meetings that Foti and Hastings attended at Sprecher's office were recorded on a NAGRA tape. During the first of these, which took place on May 6, 1988, Sprecher, Foti, and Hastings discuss the merits of a deal with Harold House, the holder of options on licenses for Russian medical technology. House, who had been solicited by Hastings, was associated with a company called Med–Trade International ("Med–Trade"). On the May 6 tape, the three conspirators plan what the division of World Wide stock would be among themselves, Roth, House, and others should the Med–Trade deal go through. Hastings met with House at La Guardia airport in the same month to discuss the medical technologies and financial backing for the proposed merger.

The next recorded meeting took place on May 31, 1988. During a discussion with Foti before Hastings arrives, Sprecher agrees to put the shares of World Wide that Foti is to receive as a result of the transaction temporarily in the name of KKP, and explains how Foti can get them back in order to sell them. After Hastings arrives, Sprecher places a call on a speaker phone to Ray Griffen of Texas to discuss an alternative to the proposed House deal.

### 8. Additional SEC filings

In addition to the April 21 letter, December 15 minutes, and December 16 Form 8–K, Sprecher prepared other World Wide documents that contained false statements and caused them to be filed with the SEC. These included an SEC Form 10–Q for the quarter ended February 29, 1988 (the "February 29 10–Q"), received by the SEC on June 1, 1988, and a Form 10–Q for the quarter ended May 31, 1988 (the "May 31 10–Q"), received by the SEC on June 23, 1988. Both of these state, in identical language, that

> [o]n December 16, 1987, a special Board of Directors meeting was held wherein new officers and directors were elected replacing the prior officers and directors. The new President is John J. Hastings III. In addition, the Board of Directors authorized the issuance of 46,377,000 additional restricted shares to be issued to John J. Hastings III, as compensation for services and for use of the Company's office at his residence.

(GX 309, GX 310.) This representation was, of course, false, since no meeting had taken place on December 16, 1987 during which officers and directors were elected or stock authorized.

In reference to the potential for a merger or acquisition as of the close of the quarter for which the report was filed, both documents also state in the same language that "at the present time, there are no prospects of that occurring." (GX 309, GX 310.) This statement was clearly false as of the close of the May 31, 1988 quarter, by which time Sprecher and his coconspirators were actively pursuing real merger prospects for World Wide and were seriously considering the potential deal with House. With respect to the February 29 10–Q, although some discussions about World Wide took place in February, it is not clear beyond a reasonable doubt that there were prospects of a merger at that time.

### 9. Jersey Transfer letters

A series of letters from Sprecher to Jersey Transfer provide additional proof of Sprecher's acts in furtherance of the con-

spiracy among Sprecher, Foti, Hastings, and Roth to sell unregistered stock to the public. The first of these, dated March 31, 1988, the day after the March 30 meeting (the "March 31 letter"), directs Jersey Transfer to issue 46,377,000 legended, or restricted, shares of World Wide to Hastings on the basis of the December 16 minutes, which Sprecher encloses. The letter continues: "Additionally, I am also informing you of the new officers and directors who were elected at a December 15th meeting of the Board of Directors.... I would appreciate your issuing the above-described shares in one certificate as rapidly as possible and FEDERAL EXPRESSING it to me at my office." (GX 312A.) A record of Jersey Transfer confirms that these Hastings shares were issued. (GX 312B.)

On June 2, 1988, Sprecher again wrote to Jersey Transfer (the "June 2 letter"). With this letter, Sprecher enclosed World Wide stock certificates in the names of Jacob Roth (totaling 3,504,500 shares), Aharon Markovitz (1,000 shares), Abraham Markovitz (1,000 shares), Kedishas Aharon O'Hadas (68,000 shares), Bella Roth (4,000 shares), Morris Roth (3,000 shares), and himself (1,500). The June 2 letter states in part:

> Pursuant to [Rule] 144(k), the legend must be removed from all of these shares, since the individuals who own these shares intend to sell the shares. The only question which arises is that some of the individuals who own these shares were officers and directors of the corporation.
>
> Pursuant to 144, if these individuals were not officers and directors for more than three (3) months, Rule 144(k) still applies. In the instant case all the individuals were not officers or directors of the company for more than three (3) months. Therefore, as attorney for the company, I am instructing you to remove the legend from these shares.

(GX 313A.) In the letter, Sprecher further directs that the newly freed up shares be-

longing to Roth be divided in accordance with Roth's instructions: one million shares are to be put in the name of Griffin, the business associate whom Sprecher had contacted in connection with the World Wide deal; one and a half million shares, having been "donated" to KKP, are to be put in KKP's name; 500,000 shares are to go to Libram Enterprises, Ltd., a shell belonging to Foti; and the remainder are to be reissued to Jacob Roth. Jersey Transfer carried out the "freeing up" and initial disposition of the Roth stock in accordance with the June 2 letter, and sent the new certificates to Sprecher.

On June 27, 1988, Sprecher instructed Jersey Transfer by another letter to transfer 44,000,000 of Hastings' 46,377,000 restricted World Wide shares to House, "pursuant to the Private Placement Exemption of the Securities Act of 1933." (GX 314A.) This letter thus reflects the consummation of the Med–Trade merger. According to the letter, the remainder of the Hastings shares are to be divided among Sprecher, Hastings, Griffen, a Foti nominee, and two business associates of Hastings who participated in the deal. A Jersey Transfer document shows that this was done.

In a letter dated July 1, 1988, Sprecher notified Jersey Transfer that his "client" KKP had sold some of its World Wide shares, and requested that certificates be issued in varying amounts to Hastings and several Hastings and Foti nominees, with the balance of the shares to remain in the name of KKP. Thus most of the Roth shares that had been transferred to KKP ended up in the hands of Foti and Hastings; those that remained in the name of KKP, of course, stayed under Sprecher's control.[8] This transaction, like the others, was carried out by Jersey Transfer.

*E. 1985 Perjury and Obstruction of Justice—Counts Nine and Ten*

In February 1985, the Securities and Exchange Commission ("SEC") commenced a formal investigation of certain small issuer stocks with which Sprecher had some association. Sprecher is charged in count nine

---

8. On July 11, 1988, 354,500 shares of World Wide were deposited into the NAV–AIR account at Western Capital and were sold from that account throughout the remainder of 1988.

of the indictment with six specifications of perjury while testifying under oath at a deposition conducted by officers of the SEC on May 1 and 2, 1985 in connection with the investigation. Count ten charges Sprecher with obstruction of justice on the basis of the same testimony.

The transcript of the 1985 deposition shows that Sprecher was duly sworn at the outset of the questioning. The perjurious and obstructive statements alleged are the underlined responses contained within the following excerpt from Sprecher's testimony:

Q. What types of businesses, if any, does Kahila, Kadeshia, Parkofski engage in?

A. I really don't know. I really don't know.

That would be asking me like what the Mormon Church, you know, gets involved in, or the Presbyterian.

I really don't know.

I know that they built the development in Israel.

. . . .

Q. Do any of the people associated with Kahila, Kadeshia, Parkofski have titles such as chief man? Investment counselor? Vice-president? Assistant Rabbi?

Does anybody have any titles?

A. I really—I think for the original title there was some secretary and director, but that's about it.

I really don't know who—if they have certain titles, it's a loose type of a title.

. . . .

Q. To the extent that anybody within the United States is in a governing position within Kahila, Kadeshia, Parkofski, who is that?

A. I have no idea.

You see in other words, this is one of the Klausenberg type of group which I told you is world-wide.

This is the one which is in Israel that's based.

This is the one that I know quite well. In fact, I have donated quite a bit of money to it.

One of the rooms in that building over there, and I don't know if my attorney will say that I [am] hanging myself or not, but I will state this. One of the rooms in that Yeshiva there, I dedicated in the memory of my father when he died.

. . . .

Q. Do you know anybody in the United States—do you know the name of anybody in the United States, connected with Kahila, Kadeshia, Parkofski?

A. Not at the present time, no.

There was somebody else connected, but he's also left to Israel.

. . . .

Q. —Let me finish the question.

Have you ever participated in [an] investment decision to buy or sell any of the securities or any of the stocks that are listed in the formal order, dated February 12th, 1985 in this matter?

A. Absolutely not.

Q. Does Kahila, Kadeshia, Parkofski have a bank account in the United States?

A. I am not sure one way or the other.

It had a bank account at the Atlantic Bank for a while where I was with—Nechemia had it there.

Then when I left it, I think he opened one up in Chase Manhattan, but I am not sure.

(GX 104 at 164–75.) [9]

The formal order of investigation pursuant to which the above testimony was given pertained to fifty-six small issuers for which Sprecher had been identified as "counsel, agent for service, officer, director, or promoter." (GX 103 at 2.) According to the credible testimony of Jacob I. Levine, an investigator assigned to assist in the SEC's 1985 investigation of Sprecher's holdings, the information the SEC was seeking from Sprecher regarding KKP was

9. Minor typographical errors appearing in this excerpt from the transcript of Sprecher's testimony and the excerpts that follow have been corrected without notation.

material to the investigation in that the SEC was attempting to determine whether KKP was "a bona fide shareholder or a nominee for somebody else." (Tr. at 48.) The significance of the sought-after information is underscored by the fact that KKP traded in a number of the securities listed in the order.

Sprecher argues that the statements at issue were the product of a "jousting" match between the questioning officer, Thomson von Stein, and himself—in essence, that he was being crafty but not untruthful in responding as he did to von Stein's questions. He also argues that, as a result of his responses to questioning at an earlier SEC hearing in 1981 and at the same 1985 SEC hearing, the SEC was aware of his relationship with KKP and the fact that there were actually two KKP's, an American entity and an Israeli entity.

Sprecher relies in particular on a portion of the 1981 SEC proceeding, quoted in relevant part below:

Q. Doctor Sprecher have you ever heard of an entity called Kahila, Kadeshia, Parkofski?

A. Yes.

Q. And, would you please tell us how you've heard of it?

A. There are two Kahila, Kadeshia, Parkofski's, so I would suggest you go ahead and you ask specifically which ones.

Q. Why don't you tell us first what both of them are?

A. They are synagogues and religious activities. One is a synagogue in Haifa Israel, originally started approximately 50 years ago, maybe more to the time it was originally started in Poland and then when—and then moved to Israel. It's I believe incorporated in Israel under the Turkish laws of a religious institution. That one is in Haifa, due to certain tax benefits, which are available to—I don't know if it is important to go into tax law, a charitable institution in Israel is not exempt under the I.R.S. code over here. It would have to be set up as a different institution over here. There was therefore organized approximately a half of year ago, a Kahila Kadeshia Parkofski in the United States which is exempt under the I.R.S. numbers, and I don't know what records you have, but if you would have records, they are therefore two different addresses. One of the organizations was not an American organization it had only a mailing address at 114 Liberty Street. I believe right now it has an address, it's in the Willimsburg, I think it's Hooper Street, the exact address. I presume the next question you would want to know is my relationship with—

Q. Precisely.

A. With regard to the first organization, it—Rabbi Glickman, whom I've known for years, and who also came from my—from Poland. I did certain representation, not as an attorney because I wasn't an attorney at that time, but since he lives in Israel coming back. I also donated certain sums to it in Haifa.

With regard to the new one over here, the one established approximately a half a year ago, I was the attorney and listed as a Rabbi for the incorporation, because when it first started it had to be done as a temple residence which was set up in my house in the incorporation. When it cleared then it would have to be set up as an official synagogue because you have people pray in there otherwise you can't have the tax advantages or anything else. At that point, I'm not an officer or director of it at that point. I am the attorney representing certain aspects to it, over here in the United States.

Q. All right Doctor, at present in the United States, does Kahila, Kadeshia Parkofski have officers?

A. No, all the officers are now in Israel. In other words for the original incorporation you have to have United States citizens. And, these were obviously set up as to the point to incorporate it. At this point, there are no directors officers who are American citizens.

Q. All right, would you please give us the names of the officers and directors that you know of?

A. To my best ability. There is Rabbi Glickman.

(GX 106 at 35–38.)

Sprecher also points to the following excerpt from his 1985 testimony:

Q. Are you familiar with an organization known as Kahila, Kadeshia, Parkofski?

A. What's the address?

Q. 187 Hooper Street.

A. That's Klausenberg.

. . . .

Q. . . . .

I have seen that listed different ways; I have seen it listed as Kahila, Kadeshia, Parkofski and Kahil, Kadeshia, Parkofski, Ltd.

What—when you say that's—

A. That's a sub-group of Klausenberg. In fact, I know the person who heads that particular part in Israel. We have done some legal work for them.

Q. And who is that person?

A. His name is Glickman, Rabbi Glickman.

I have even given some donations to that place.

Q. When you say it's a "sub-group", . . .

A. It's the same thing as I told you about the Presbyterian.

The address there—you see the Kahila Kadeshia means the holy congregation Parkofski. There are a few of them over there.

But one time you gave the address, and then I knew which one you were talking about.

It's a sub-group in the fact that they have a synagogue there and a boy's school.

Q. Well, does Kahila, Kadeshia, Parkofski have any legal status?

A. Oh yes.

Q. What is that?

A. It's a religious organization, a religious corporation, both here and in Israel.

. . . .

Q. Can you find it in the phone book?

A. No. I doubt that you will find it in the phone book at all, because it's under the Klausenberg.

I said that these are sub-organizations there and that's main. You could find it in the phone book yes, in Haifa.

Q. Haifa?

A. —In Haifa, Israel.

Q. But not in the Brooklyn phone book?

A. No.

Q. All right.

A. —Not in the Brooklyn phone book.

Q. All right.

A. And many of these institutions you won't find in the book.

As I said, they would be under that umbrella organization.

(GX 104A at 154–60.)

According to the defendant, these exchanges put the SEC on notice that in questioning him about KKP, the SEC should specify to which KKP the question referred, or else the answer Sprecher gave might be inapposite. Thus Sprecher asserts that in the 1985 testimony, because von Stein did not so differentiate, Sprecher's responses sometimes referred to the American KKP and at other times referred to an Israeli organization, and, seen in this light, were not necessarily inaccurate.

Rather than agreeing with the defendant that the cited portions of his 1981 and 1985 testimony clarify the testimony charged as false in counts nine and ten, I find that these transcripts underscore the deliberately inaccurate and misleading nature of the testimony at issue. The evidence does not support the existence of a second KKP in Israel. Notably, it was the American KKP—not an Israeli organization—that had a bank account in Israel, and Sprecher and his wife were the sole signatories of that account. But even assuming that an Israeli entity of some sort existed, I find that Sprecher's testimony at the 1985 hearing—with the exception of the fifth specification, as is explained below—in addition to being knowingly false, was clearly designed to confuse the SEC and obfuscate the true nature of his relationship with the one KKP that has been shown to exist, the

New York corporation that he controls. Notably, three of the questions in the 1985 hearing to which Sprecher responded by disclaiming knowledge of KKP's activities specifically requested information regarding KKP's presence *in the United States.* Even under Sprecher's analysis, these three questions at least should have elicited responsive and truthful answers; they did not.

In addition to his "jousting" defense, Sprecher makes arguments regarding specific statements charged as perjury in count nine. As to the first question and answer, in which he was asked in what businesses KKP engaged, Sprecher contends that despite the fact that he initially denied having any knowledge about the subject by responding, "I really don't know. I really don't know. That would be like asking me what the Mormon Church, you know, gets involved in, or the Presbyterian," he did give a partial answer because he subsequently modified his denial by commenting, "I know that they built the development in Israel."

Even assuming Sprecher's modification was accurate, his answer to the examiner's question was, on the whole, untrue. As the person who controlled KKP, Sprecher did know in what businesses KKP was engaged; he knew much more about KKP than that it had built a development in Israel. Thus, the substance of Sprecher's response was false.

As to the fifth specification of perjury, Sprecher argues that his response was truthful if one considers him to have been responding to a question different from the one actually put to him by the examining officer. A fuller excerpt of the portion of the transcript at issue reflects the following exchange:

> Q. Does Kahila Kadeshia have any committee which in substance makes investment decisions?

MR. SEYMOUR [Sprecher's counsel]: I think you have already asked that question in that—

MR. VON STEIN: I asked about individuals.

THE WITNESS: I said in probability.

You see, you are looking at a religious organization in terms of a corporation.

I would assume that you have to look at it in terms of a church group which would be the closest genealogy.

Such [a] group changes, it's fluctuating. They may give it to one person, they may give it to another person. They may leave the decisions in one person's hands, et cetera.

MR. SEYMOUR: I suppose that a legitimate question would be whether Dr. Sprecher ever served on that committee and advised them to purchase or sale any of these—sell any of these stocks.

If that's what you are going on, I want to put it to him directly.

MR. VON STEIN: I will ask that question.

BY MR. VON STEIN:

Q. Have you ever—

A. I have—

Q. —Let me finish the question. Have you ever participated in [an] investment decision to buy or sell any of the securities of any of the stocks that are listed in the formal order, dated February 12th, 1985 in this matter?

A. Absolutely not.

(GX104A at 173–75.)

Although the evidence shows that Sprecher did participate in investment decisions in which KKP bought and sold securities listed in the 1985 formal order of investigation,[10] I believe that the exchange between Sprecher's counsel and von Stein leading up to the fifth allegedly perjurious statement rendered the question giving rise to the statement ambiguous. It is not clear whether von Stein was seeking information about Sprecher's participation through an investment committee, or his individual par-

---

**10.** Monthly statements of the KKP account at Datek show that, from 1982 to 1985, KKP traded in the following securities listed in the order of investigation: BGS Energy, Inc., Brush Creek Mining & Development Co., Inc., Chatham Energy Corp., Economic Consulting, Inc., Multivest Corp., Oceanic Minerals Corp., Pubcoa, Inc., and Salem Resources, Inc.

ticipation, in KKP's investment decisions. In the exchange, von Stein acknowledges that he has already asked about individual participation and that he instead will ask the question Seymour has suggested regarding Sprecher's participation on a committee. Because there is no evidence that Sprecher ever served on an investment committee for KKP, Sprecher's denial in answer to an ambiguous question is not false beyond a reasonable doubt.

In sum, what Sprecher terms "jousting" I find to be deliberate lying and purposeful obstruction. The clear intent of Sprecher's 1985 testimony was to create the false impression that he had little knowledge or control of the New York corporation known as KKP, and by false answers under oath to impede the SEC investigation.

### F. 1989 Obstruction of the SEC's Utah Investigation—Count Eleven

In January and February 1989, the SEC subpoenaed the records of the KKP and NAV–AIR bank accounts pursuant to an investigation of a number of formerly defunct Utah corporations. Sprecher responded by instituting a lawsuit against the SEC in the United States District Court for the District of Utah to quash the subpoenas on the ground that they constituted a harassing device and violated his and his clients' constitutional rights. *Sprecher v. SEC*, No. 89–C–203–J (D.Utah filed 1989). Count eleven of the indictment charges Sprecher with obstruction of justice in connection with a false representation he made in a document that he filed with the court in the course of this litigation.

On May 15, 1989, Sprecher executed an affidavit in support of a brief entitled "Reply to Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6) Deliberately Mis–Labelled 'Verified Opposition to Motion for Order Pursuant to Customer Provisions of the Right to Financial Privacy Act of 1978' " (the "reply brief"). The affidavit and the reply brief were filed together in the Utah District Court on May 16, 1989 as a reply to the SEC's answer to Sprecher's complaint. In the affidavit, Sprecher stated that his "only relationship with the plaintiffs [in the lawsuit], Kahila Kadeshia

Parkofski and NAV–AIR, and any of the 38 companies mentioned by the defendant has been limited to attorney-client relationship." (GX 202 at 2.)

Kenneth Israel, an SEC investigator who was assigned to the Utah investigation, testified that the records the SEC was seeking—which were eventually obtained—revealed that Sprecher controlled the bank accounts of both KKP and NAV–AIR and was president of KKP, information which by filing the false affidavit, Sprecher attempted improperly to influence the court to suppress.

Sprecher has argued that the affidavit was not necessarily signed in New York, and hence the charge in count eleven is not subject to prosecution in the Southern District of New York. But the evidence shows that the document, although filed in Utah, was executed in New York. The first page of the affidavit indicates just under the caption that the document originated in New York County. Sprecher's signature on the last page is notarized by Novak, who kept his offices at 350 Broadway and used a New York State notary's stamp. The cover of the accompanying reply brief gives 350 Broadway in New York as Sprecher's address, and the two lines just above and to the left of Sprecher's signature on the reply brief read "New York, New York/May 15, 1989." I find that the affidavit was signed in New York City.

Defendant also points to a portion of his oral argument in the same Utah court proceeding in which, Sprecher contends, he explained his relationship with KKP in a fulsome fashion:

> It's got—it's got—it's tax exempt. It's being looked at. It's you name it: It's got—Your Honor, I don't want to describe the fact of the synagogue. I can even tell you the reason why: It means, in Hebrew, "Kahila" means congregation, "Kadeshia" means holy, and "Parkofski" is the name of an individual; and I will state that it is the individual who comes from the town in Poland wherein my family came, who was a saint, who was killed by the Nazis. We organized

it. We did it. And I've done everything with it.

(GX 203B at 84–85.). Sprecher's generalized description of the origin of KKP does not erase the very specific false statement in his affidavit about his relationship to KKP. In the absence of an express retraction, the Utah judge could not be expected to ignore the affidavit. Furthermore, the excerpt has no bearing on NAV–AIR or Sprecher's misrepresentation of his relationship with that corporation.

Finally, the defendant has argued that the statement in the affidavit can be read as an accurate representation of his relationship to KKP and NAV–AIR if one considers the statement as meaning that the only relationship to Sprecher that KKP and NAV–AIR had in common with the other companies under investigation by the SEC was an attorney-client relationship. In support of this interpretation, Sprecher cites a portion of the reply brief which states that one of the acts complained of in the litigation is "[t]he subpoenaing of the bank records of a religious organization, plaintiff Kahila, without any reason except that Sprecher was the attorney for the organization." (GX 203A at 3.) That Sprecher chose to characterize the SEC subpoenas as having been issued solely for the purpose of harassing his clients does not render the factual declarations he made in furtherance of this strategy any more truthful, however.

The plain import of the statement in the affidavit is that Sprecher had no connection with KKP and NAV–AIR, or the other subpoenaed entities, other than as their lawyer. The purpose of that falsehood was to persuade the court to quash the subpoenas and thereby prevent the SEC from examining the records of KKP and NAV–AIR as well as the records of the other companies. By that statement, Sprecher deliberately attempted to obstruct justice.

### G. Consciousness of Guilt—Sprecher's Efforts to Prevent the Production of Bank Leumi Records

In March of 1991, Sprecher received a grand jury subpoena in connection with this case ordering him to produce the bank records for all accounts at Bank Leumi in Jerusalem over which he had financial control or signatory power, including the KKP account. Novak received a subpoena for the records of the S.J. Ventures account at Bank Leumi. In addition, Bank Leumi received subpoenas relating to these accounts.

#### 1. The Israeli court order

During the last two weeks of August 1991, Novak had a conversation with Sprecher in which Sprecher told Novak that Bank Leumi had not produced the subpoenaed documents because Sprecher had, through an attorney retained in Israel, obtained an ex parte order from an Israeli court "making it difficult or impossible for information to be released from his accounts." (Tr. at 1166.)

#### 2. Sham corporate resolutions

Subsequent to his conversation with Sprecher regarding the subpoenas, Novak researched the issue of whether he and Sprecher could be compelled to produce the records of their Bank Leumi accounts and determined that under the decision of the Supreme Court in *Doe v. United States*, 487 U.S. 201, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988), he and Sprecher could be required to sign consent forms directing the bank to furnish their bank records to the prosecution. In light of his finding, Novak conceived the idea of preparing sham corporate resolutions purporting to revoke his and Sprecher's authority as signatories of the subpoenaed accounts. Novak's conclusion was that if the Government didn't have evidence of his money in Israel, "then they would have a very difficult time proving the case.... I thought if I outfoxed the government by not having them get the information about my bank account, then I would be one step farther down the road towards an acquittal." (Tr. at 1188.) Novak discussed the plan with Sprecher, who said it was a good idea, and instructed him to draft the resolutions.

Novak proceeded to create corporate minutes for his own company, S.J. Ventures, and also for two of Sprecher's corporations, NAV–AIR and Capital Makers,

Ltd. ("Capital Makers"). Sprecher declined to use the minutes Novak drafted for the Sprecher corporations, but accepted the S.J. Ventures minutes from Novak, as well as letterheads that Novak had prepared for NAV–AIR and Capital Makers. Sprecher agreed to fax and mail the sham S.J. Ventures board resolution to Bank Leumi.

Sprecher subsequently drafted and sent three sets of sham corporate minutes to Bank Leumi in Israel, in addition to the minutes Novak had created for S.J. Ventures. The three prepared by Sprecher— one for KKP, one for NAV–AIR, and one for Capital Makers—are virtually identical except for the letterhead and the names signed at the bottom. Each states that a board of directors meeting for the company took place on July 31, 1991, during which the following resolution was adopted:

> RESOLVED, that our Attorney and Officer of the Corporation Benjamin G. Sprecher retain his authority to operate, open and transact all business with regard to bank accounts for the corporation except; due to circumstances which have occurred to him recently, the board revokes all authority he had in the past to reveal any information concerning bank accounts of the corporation or to authorize the bank revealing of such information to any individual, agency or entity. And it is further RESOLVED that any individuals presently authorized by the corporation such as Benjamin G. Sprecher, his wife, his daughter still retain the authority to transact all other business with regard to the bank accounts for this corporation. Such as depositing monies, withdrawing monies, making loans, etc. except that they may not reveal or authorize the revealing of any information concerning the corporation bank accounts. And it is further RESOLVED that Nechemia Glickman [Charles Rosen in the case of NAV–AIR and Tom Good in the case of Capital Makers] shall communicate with all banks [with] which this corporation has an account informing them of this resolution and that in the future in the absence of any other directions only Nechemia Glickman may authorize the revealing of

any information concerning the corporation's bank accounts.

(GX 530.) The KKP resolution is signed "Nechemia Glickman," the NAV–AIR resolution, "Charles Rosen," and the Capital Makers resolution, "Tom Good." Each was both faxed and sent by mail to Bank Leumi in Israel.

The signatures on the three documents all seem to be in the same handwriting. Moreover, a government fingerprint expert who examined the documents was able to identify Sprecher's right palm prints on the original KKP and Capital Makers resolutions that were mailed to Bank Leumi.

### 3. The Kahn letter

In addition to the corporate resolutions, Sprecher was the author of a letter to Bank Leumi in Jerusalem on the stationery of Charles Kahn, a lawyer who had previously shared office space with Sprecher at 11 Park Place and later at 350 Broadway. Sprecher forged Kahn's signature on the letter dated September 4, 1991, which purports to be a communication from Kahn as attorney for KKP, NAV–AIR, S.J. Ventures, and Capital Makers. Kahn testified in a truthful manner that he never saw or authorized the letter. The letter states in pertinent part:

> My clients, Kahila Kadeshia Parkofski, Nav–Air, SJ Ventures, and Capital Makers, have informed me that your bank desires a letter from me as independent counsel....
>
> At the outset, I should state that the minutes you received are true and accurate and, therefore, even though Dr. Sprecher is still an attorney and an officer of three of these corporations, he does not have the power, nor does his wife or family, to authorize the release of information concerning the bank accounts of the corporations.

(GX 530.)

It is difficult to imagine more compelling evidence of consciousness of guilt than the elaborate efforts of Sprecher to prevent the production of the Bank Leumi records. He deliberately engaged in fabrication and forgery in order to suppress the records

that disclose the existence and his control of the KKP and NAV–AIR bank accounts in Israel, and the true disposition of the Towers tax fund.

## THE LAW

### A. Counts One and Two—the Towers Conspiracy

■ Count one of the indictment charges that Sprecher violated 18 U.S.C. § 371 by conspiring with others, including Novak, to defraud the United States and the IRS, and to commit an offense against the United States by violating 18 U.S.C. § 1001. The first prong of this count alleges that Sprecher conspired to defraud the IRS by providing the TIN for a tax-exempt organization, KKP, in connection with the sale of the Towers stock, when in fact the proceeds of the sale were destined for taxpaying individuals and entities. The second prong alleges that Sprecher conspired to make a false statement in a matter within the jurisdiction of the IRS.

18 U.S.C. § 371, the general criminal conspiracy statute, provides in pertinent part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

■ In order to prove that a defendant is guilty under section 371, the Government must demonstrate beyond a reasonable doubt either that he participated in an agreement to defraud the United States government or in an agreement to commit an offense against the United States. The prosecution must show that there was 1) an agreement between the defendant and others as to the object of the conspiracy; 2) specific intent to achieve the object of the conspiracy; and 3) at least one overt act in furtherance of the conspiracy by the defendant or one of his coconspirators. *United States v. Montour*, 944 F.2d 1019, 1024 (2d Cir.1991).

■ Under section 371, it is not necessary for the Government to establish an intent to defraud the United States of a money or property interest; rather, it is sufficient that the defendant engaged in acts that interfered with or obstructed a lawful governmental function by deceit, craft, trickery, or by means that were dishonest. *United States v. Nersesian*, 824 F.2d 1294, 1313 (2d Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380, *and cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987), *and cert. denied*, 484 U.S. 1061, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988). Thus, if a defendant conspired with others to interfere with the IRS's interest in collecting the data to which it is lawfully entitled, he may be found guilty of a conspiracy to defraud under 18 U.S.C. § 371. *Id.*

■ The evidence in this case establishes beyond a reasonable doubt that in late 1989 through early 1990, an agreement existed among Sprecher, Novak, and Foti to take and divide among themselves the tax fund resulting from the 1989 settlement agreement, and to deceive the IRS by making it appear that the tax fund went to KKP, a tax-exempt religious corporation. In furtherance of this agreement, Novak, at the Towers closing, supplied the KKP TIN as the TIN to be reported for the tax fund, even though the monies were ultimately destined for the personal use of the three conspirators. Sprecher gave Novak the KKP TIN to take to the closing, and instructed him to supply that number as the TIN for the tax fund. Supplying the KKP TIN was an overt act in furtherance both of the object to defraud the IRS and of the object to make a false statement in a matter within the jurisdiction of the IRS.

■ Sprecher focuses on the language of the indictment, which charges in the object portion of count one that it was part of the conspiracy that he and Novak "falsely and fraudulently stated to Meyerson & Co. that the tax identification number for KKP, a corporation with tax-exempt status, was the tax identification number for the NNS account." Sprecher asserts that because, at the closing, Novak did not explicitly

state that the KKP TIN was the TIN for the NNS account, there was a variance from the indictment in the proof at trial.

■ Sprecher's argument is without merit. Sprecher has failed to demonstrate that the facts established at trial differ materially from those alleged in the indictment. *See United States v. Zingaro*, 858 F.2d 94, 98 (2d Cir.1988) (quoting *Gaither v. United States*, 413 F.2d 1061, 1071 (D.C.Cir.1969)). Whether Novak explicitly said, "This is the TIN for the NNS account," or clearly implied it by responding to Brader's request for the TIN for the account with the KKP TIN, is not material because Novak deliberately responded with the KKP TIN in a context in which he knew and intended that those present at the closing and the broker would believe that the TIN he was giving was the TIN for the account. Moreover, Sprecher has failed to show how the difference he asserts in the wording of count one prejudiced his defense, a requirement of a successful claim of variance. *United States v. Morgenstern*, 933 F.2d 1108, 1115 (2d Cir. 1991).

The language of the indictment clearly put Sprecher on notice of the charge. I find Sprecher guilty of conspiring to defraud the United States and the IRS, and of conspiring to make a false statement within the jurisdiction of the IRS in violation of 18 U.S.C. § 1001 as alleged in count one.

■ Count two charges under 18 U.S.C. §§ 2 and 1001 that Sprecher made, or aided and abetted in making, a false statement within the jurisdiction of the IRS in providing the KKP TIN as the correct TIN for the transaction.

Section 1001 provides

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement

or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1001. In order to establish a violation of section 1001, the Government must prove that the defendant 1) knowingly and willfully 2) made a statement 3) in relation to a matter within the jurisdiction of a department or agency of the United States, 4) with the knowledge that it was false or fictitious or fraudulent. *United States v. Bilzerian*, 926 F.2d 1285, 1299 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991).

■ Materiality of the statement is not a requirement under section 1001. *Id.* (citing *United States v. Elkin*, 731 F.2d 1005, 1009 (2d Cir.), *cert. denied*, 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984)). Nor must it be shown that the statement was actually submitted to a department or agency of the United States, but only that it was contemplated that the statement was to be utilized in a matter within the jurisdiction of such a department or agency. *United States v. Candella*, 487 F.2d 1223, 1227 (2d Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974).

■ The representation that the TIN belonging to KKP was the correct TIN for the tax fund was a knowingly false statement in relation to a matter within the jurisdiction of the IRS. Sprecher and Novak expected and intended that it would be relied upon by the IRS. Indeed, the only purpose of a TIN is to aid the IRS in the tracking of monies by identifying the taxpayer. Novak's provision of the KKP TIN at the closing thus constituted a false statement within the jurisdiction of a government agency.

■ Under 18 U.S.C. § 2, someone who "commits an offense against the United States or aids, abets, counsels, commands, induces or procures" the commission of an offense against the United States is punishable as a principal for the underlying offense. To show a violation of section 2 the prosecution must first establish that the underlying crime was, in fact, committed by someone. *United States v. Perry*, 643

158

F.2d 38, 45 (2d Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981). If a defendant in some way associated himself with the venture, participated in it as in something that he wished to bring about, and sought by his action to make it succeed, he is guilty under section 2. *United States v. Ginsberg,* 758 F.2d 823, 832 (2d Cir.1985) (citing *Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949)).

It is clear beyond a reasonable doubt that Sprecher, expecting and intending that the false information would be relied upon by the IRS and would mislead the IRS, instructed Novak to take the KKP TIN to the Towers closing and to represent it as the TIN for the tax fund. It has also been proven beyond a reasonable doubt that Sprecher had a stake in the success of the criminal enterprise. When Novak made the false statement at the closing in violation of 18 U.S.C. § 1001, Sprecher was guilty of aiding and abetting that crime.

*B. Counts Three through Seven—the World Wide Conspiracy*

 Count three of the indictment charges that Sprecher conspired with others to violate 15 U.S.C. §§ 77e and 77x by selling unregistered securities illegally in the market and to violate 18 U.S.C. § 1001 by making false statements in a matter within the jurisdiction of the SEC. Specifically, this count alleges that the defendant and his coconspirators pursued a plan to sell in the market restricted shares of World Wide through the falsification of corporate documents that purported to "free up" insider shares pursuant to Rule 144(k) promulgated under the Securities Act of 1933. This count also alleges, as overt acts in furtherance of the conspiracy, that Sprecher caused to be sent to the SEC documents containing false statements, including the December 15 minutes, the December 16 minutes, the December 16 Form 8–K, the April 21 letter, the February 29 Form 10–Q, and the May 31 10–Q.

*1. Rule 144(k)*

In order to analyze this count of the indictment, some understanding of the reg-

istration provisions of the 1933 Act and the Rule 144(k) exception promulgated thereunder is required. 15 U.S.C. § 77e provides that it is unlawful for any person directly or indirectly to make use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, sell, or deliver unregistered securities. Securities transactions by persons other than issuers, underwriters, or dealers, however, are expressly exempted from the section 77e prohibition. 15 U.S.C. § 77d. 15 U.S.C. § 77x prescribes criminal penalties for willful violations of the 1933 Act, including the willful violation of rules and regulations promulgated by the SEC under the authority of the 1933 Act.

Rule 144 promulgated by the SEC under the Act defines a class of persons deemed not to be engaged in a distribution of securities and therefore not underwriters, that is, persons whose sale of securities is exempt from the general registration requirements of the 1933 Act pursuant to 15 U.S.C. § 77d. Subdivision k of Rule 144 implements the section 77d exception from the registration requirements of the 1933 Act for

restricted securities sold for the account of a person who is not an affiliate of the issuer at the time of the sale and has not been an affiliate during the preceding three months, provided a period of at least three years has elapsed since the later of the date the securities were acquired from the issuer or from an affiliate of the issuer.

17 C.F.R. § 230.144(k). Securities that are acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering are restricted securities. 17 C.F.R. § 230.144(a)(3)(i). The effect of Rule 144(k) is to permit the sale to the public of unregistered securities provided that three years have elapsed from the time the securities were acquired from the issuer or an affiliate of the issuer, and provided that the seller is not an affiliate and was not an affiliate

of the issuer for at least three months prior to the time of sale.

An "affiliate of an issuer of securities" is defined by Rule 144 as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.-144(a)(1). Stock ownership is but one aspect of control, which can rest with more than one person at the same time or from time to time. *United States v. Corr,* 543 F.2d 1042, 1050 (2d Cir.1976). Thus whether someone is an affiliate for the purposes of Rule 144(k) depends upon "the totality of the circumstances including an appraisal of the influence upon management and policies of a corporation by the person involved." *Id.*

### 2. The conspiracy to sell unregistered securities and make false statements to the SEC

The evidence is overwhelming that Sprecher participated in a conspiracy with Roth, Foti, and Hastings to sell unregistered World Wide stock illegally in the market and to make false statements in a matter within the jurisdiction of the SEC. To facilitate the illegal public sale of the unregistered World Wide stock, Sprecher met with Foti and Hastings on a regular basis from February through May of 1988. During the same period, Sprecher was in communication with Roth and represented Roth in the World Wide negotiations. The defendant also created and backdated corporate documents for submission to the SEC so that it would appear that Roth was no longer either an officer or a majority shareholder—and thus no longer an affiliate—of World Wide as of December 16, 1987, and that the requirements of Rule 144(k) had been met.

In fact, Roth remained an affiliate of World Wide at least through March 30, 1988 because he did not resign until after the March 30 meeting, and because he owned the majority of outstanding shares of World Wide until Hastings was issued the 46,377,000 shares following the March 30 meeting. That is, Roth did not relinquish control of World Wide until March 31 at the earliest.

Sprecher, too, was an affiliate of World Wide both by virtue of his relationship to Roth and by virtue of his central role in the plans to effect a merger. The tape-recorded meetings he conducted in his office demonstrate that Sprecher dominated the discussion and passed on the merits of potential deals. It was Sprecher who created and submitted the false corporate records for World Wide to the SEC to facilitate the merger plan and directed the distribution of the Roth shares so that he and his coconspirators, Roth, Foti, and Hastings, each controlled a portion of the newly freed-up stock. There is no doubt that Sprecher was not acting merely as an attorney, but was an active participant in and major influence on the "management and policies" of World Wide until it was acquired by House.

Sprecher and Roth were both affiliated with World Wide at least through March 31, 1988. When Sprecher instructed Jersey Transfer on June 2, 1988 that the World Wide shares belonging to Roth, Roth's nominees, and himself should be freed up and Roth's shares distributed among various individuals and entities, those restricted shares were not legally eligible for sale to the public because they had been held by a person affiliated with World Wide during the preceding three months.[11]

11. Although Sprecher argues that the Government must prove beyond a reasonable doubt that no exemption was available before he can be found guilty of conspiring to sell unregistered shares illegally in the market, the case law does not support this contention. *See United States v. Dinneen,* 463 F.2d 1036, 1041–42 (10th Cir.1972) (burden is on the defendant, not the government, to set up and prove an exception from registration requirements of 1933 Act); *see also Edwards v. United States,* 312 U.S. 473, 482–83, 61 S.Ct. 669, 675, 85 L.Ed. 957 (1941) (government does not have to negate all possible exemptions in indictment charging conspiracy to sell unregistered securities).

Regardless of who bears the burden of proof, all of the credible evidence shows that no exemption was available for the stock Sprecher was pretending to free up.

At trial, Sprecher advanced the argument that there was not a single conspiracy to sell unregistered World Wide stock because Foti and Hastings were not involved in any part of the World Wide scheme until they sought to purchase the shell from Roth through Sprecher. Contrary to the way it is presented in the indictment, defendant argues, there were in fact two separate "spheres" of activity in connection with the World Wide shell—the first revolving around the creation of the shell and Roth's participation in that, and the second pertaining to the proposed merger and freeing up of stock. Sprecher contends that this second "sphere" was not shown to be related to the first because the merger was sought not by Roth, but by Foti and Hastings, and that, therefore, the government failed to establish the existence of the single conspiracy charged.

Sprecher's attempt to divide the scheme into two distinct spheres is flawed. Sprecher's argument is premised on Roth's not being a participant in the second "sphere" of activity. But the evidence shows that Roth was represented by and was in communication with Sprecher throughout the merger negotiations. Roth was reissued shares of World Wide after they were "freed up" by Sprecher in furtherance of the conspirators' purpose.

Nor does the law of conspiracy, which was reviewed by the Second Circuit in *United States v. Maldonado–Rivera,* support Sprecher's contention:

> The essence of any conspiracy is, of course agreement, and 'in order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.' The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan. The goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes. Nor do lapses of time, changes in membership, or shifting emphases in the locale of operations necessarily convert a single conspiracy into multiple conspiracies. . . .

> Finally, a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance.

922 F.2d 934, 963 (2d Cir.1990) (citations omitted), *cert. denied,* —— U.S. ——, 111 S.Ct. 2811, 115 L.Ed.2d 984, *and cert. denied,* —— U.S. ——, 111 S.Ct. 2858, 115 L.Ed.2d 1025, *and cert. denied,* —— U.S. ——, 111 S.Ct. 2858, 115 L.Ed.2d 1026 (1991).

Here, there was an agreement to profit by selling unregistered shares of World Wide stock in the market. That Sprecher and Roth were later joined in their plan by Foti and Hastings does not negate the existence of a single conspiracy. Sprecher, Roth, Foti, and Hastings all mutually depended upon and assisted each other in pursuing their common goal.

In sum, I find the defendant guilty under 18 U.S.C. § 371 of conspiring to sell unregistered securities in the market in violation of 15 U.S.C. §§ 77e and 77x, and of conspiring to make false statements in a matter within the jurisdiction of a government agency in violation of § 1001, as charged in count three.

### 3. False statements to the SEC

Counts four through seven are each brought under 18 U.S.C. §§ 2 and 1001. Each charges that Sprecher made, or aided and abetted in making, false statements within the jurisdiction of the SEC in a particular document that he caused to be sent to the SEC. The essential elements for proof of violation of sections 2 and 1001 and for aiding and abetting are discussed above.

Count four pertains to the April 21 letter to the SEC which falsely states that the enclosures accompanying it had previously been mailed on December 20, 1987. As discussed above, the statement in the letter was false, and Sprecher wrote the letter and caused it to be sent to the SEC. Ac-

cordingly, I find him guilty of the crime charged in count four.

Count five charges that Sprecher made or aided and abetted in making false statements to the SEC in connection with the December 16 Form 8–K. The false statements specified are that 1) the 8–K was signed on December 20, 1987; 2) World Wide was a Nevada corporation; 3) a World Wide board of directors meeting had taken place on December 15, 1987, during which new officers and directors were appointed; and 4) John J. Hastings, III had received 46,377,000 shares of World Wide on December 16, 1987. All of these statements appear in the December 16 Form 8–K or in the December 15 minutes that were incorporated into the December 16 Form 8–K.

With respect to the statement that World Wide was a Nevada corporation, no evidence was presented to show that Sprecher knew that the World Wide charter had been revoked. As to this statement, I find the defendant not guilty. The other three false statements were knowingly made by Sprecher when he created the December 16 Form 8–K for submission to the SEC. I therefore find Sprecher guilty of the crime charged in count five.

For the same reasons, I find the defendant guilty of violating sections 2 and 1001 by making similar false statements in the February 29 Form 10–Q and the May 31 Form 10–Q as charged in counts six and seven. The statements appearing in both of these 10–Q's which have been shown to be knowing falsehoods for submission to the SEC are that 1) a World Wide board of directors meeting had taken place on December 16, 1987, during which new officers and directors were appointed; and 2) Hastings received 46,377,000 shares of World Wide on December 16, 1987.

■ Sprecher makes the rather curious argument that because the first statement is inconsistent with the December 15 minutes, which purport to memorialize a change in the officers and directors on December *15*—not December 16—1987, Sprecher could not have intended to make this false statement as it is an obvious

mistake, and therefore should not be held accountable for it. I reject this argument for the obvious reason that a false statement remains false regardless of whether it is consistent with other fabrications made for the same illicit purpose. The fact that Sprecher conflated the two "meetings" or failed to correct a typographical error is of no legal significance when it is clear that the substance of the statement was false and he intended that the false information conveyed would be utilized by the SEC.

A third representation appearing in both the February 29 and May 31 Form 10–Q's, that World Wide had "no prospects" of a merger or acquisition's occurring at the close of the quarter in question, has not been proven false beyond a reasonable doubt as to the February 29 Form 10–Q, as is discussed above. Thus I do not predicate defendant's guilt of the crime charged in count six on this particular statement. That representation was clearly false, however, as of the close of the May 31, 1988 quarter, as charged in count seven.

In challenging the falseness of the "no prospects" statement, Sprecher relies on *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), in which the Supreme Court set the materiality standard for disclosure of merger negotiations for purposes of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder. The teaching of *Basic* is inapplicable to a section 1001 violation, however, where materiality is not an element and the crucial question is not whether a statement denying merger prospects constitutes securities fraud but, rather, whether it was a knowing falsehood in a matter within the jurisdiction of a federal agency.

*C. Counts Nine and Ten—1985 Perjury and Obstruction of Justice*

*1. Perjury*

Count nine charges Sprecher under 18 U.S.C. § 1621 with committing perjury by willfully making six sworn statements of material matter which he did not believe to be true in testimony before the SEC on May 1, 1985. The six perjurious statements alleged are quoted in the factual

discussion above; each represents a response to a question put to Sprecher by an SEC investigator during the 1985 hearing.

The general perjury statute under which Sprecher is charged, 18 U.S.C. § 1621, provides in pertinent part as follows:

Whoever—

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; ...

. . . .

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined not more than $2,000 or imprisoned not more than five years, or both.

In order to prove perjury, the Government must establish 1) that the defendant took an oath before a tribunal or officer authorized by law to administer oaths; 2) that the defendant made false statements while testifying under oath; 3) that the defendant knew the statements to be false at the time he made them; and 4) that the false statements were material to the issues under inquiry by the tribunal or officer. *See United States v. Debrow*, 346 U.S. 374, 376, 74 S.Ct. 113, 114, 98 L.Ed. 92 (1953); *United States v. Mulligan*, 573 F.2d 775, 779 (2d Cir.), *cert. denied*, 439 U.S. 827, 99 S.Ct. 99, 58 L.Ed.2d 120 (1978).

 As discussed above, the fifth allegedly perjurious statement by Sprecher, that he had not participated in investment decisions for KKP, has not been shown to constitute a knowing falsehood because of the ambiguity of the question to which Sprecher was responding. Therefore, I find Sprecher not guilty as to that particular statement.

 Sprecher cites *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973) in support of his argument that because his answers were unresponsive—that is, because, as he contends, he was not responding about the KKP to which the questions were directed—he cannot be found guilty of perjury. But *Bronston* does not help Sprecher.

In *Bronston*, the defendant did at one time have, but at the time of questioning no longer had, a Swiss bank account. When asked under oath whether he had ever had an account at a Swiss bank, Bronston responded, "The company had an account there for about six months, in Zurich." *Id.* at 354, 93 S.Ct. at 598. This answer was accurate, although obviously unresponsive. Bronston was prosecuted for perjury on the basis of this testimony on the theory that even though his response was literally true, it falsely implied that he had no personal Swiss bank account during the period in question. The Supreme Court overturned the perjury conviction, holding that an unresponsive but literally truthful answer was not perjury. *Id.* at 362, 93 S.Ct. at 602. In so holding, the Court reasoned that the perjury statute is not meant to encompass statements that are untrue only by "negative implication," *id.* at 361, 93 S.Ct. at 601, and noted that "the very unresponsiveness of the answer should alert counsel to press on for the information he desires," *id.* at 362, 93 S.Ct. at 601.

In each of the five remaining specifications of perjury charged in count nine, in this case, unlike *Bronston*, there was nothing about the allegedly perjurious answer or the surrounding testimony to indicate that the answer was unresponsive to the question that elicited it. As has recently been explained by the Second Circuit:

In *Bronston*, the crucial factor was that the answer Bronston gave was not responsive to the question he was asked. Therefore, the answer put the examiner on notice that he had to ask further questions. If an answer is responsive to the question, then there is no notice to the examiner and no basis for applying *Bronston*. The purpose of the *Bronston* rule is to place the burden on the examiner to probe for details during the examination.

United States v. Schafrick, 871 F.2d 300, 303 (2d Cir.1989). Here, as in Schafrick, the defendant "did not say anything that would have put the examiner on notice that the question was not being answered." Id. Sprecher's answers appeared to be responsive. Sprecher did not indicate in his responses that he was speaking solely of the Israeli KKP which he claims exists. He did not qualify his answers, even when responding to questions that explicitly called for information regarding KKP's activities in the United States.

Under the analysis in Schafrick, Bronston is also inapposite here because the falsehoods with which Sprecher is charged are not premised on "inferences attempted to be extracted from the fact of unresponsiveness." Id. (quoting United States v. Corr, 543 F.2d 1042, 1049 (2d Cir.1976)). Rather, the falsity of Sprecher's statements derives from their "clear meaning in context, and not by negative implication." Id. In five of the six specifications of perjury in count nine, Sprecher falsely and unambiguously denied knowledge of or involvement in KKP; no inferential step is required to articulate the falsehood with which he is charged. His responses were the falsehoods.

Despite Sprecher's contention that he put the SEC on notice through remarks made on other occasions and therefore should not be held responsible for the false statements he is charged with making before the SEC in 1985, the requirement of truthfulness when giving sworn testimony does not turn on a witness' whim. Because Sprecher's purposeful falsehoods were material to the SEC investigation of which the hearing was a part, and because they were responsive to the questions posed to him, I find the defendant guilty of perjury on all but the fifth specification charged in count nine.

### 2. Obstruction of justice

■ Count ten is based on the same false testimony charged in count nine. Count ten alleges that Sprecher knowingly and corruptly attempted to influence, obstruct, and impede the due and proper administration of law by the SEC in violation of 18 U.S.C. § 1505 by deliberately conceal-

ing his knowledge concerning matters involving KKP that were material to the SEC's investigation, as specified in count nine.

■ 18 U.S.C. § 1505, entitled "Obstruction of proceedings before departments, agencies, and committees," provides in part as follows:

Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, ...

Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

A defendant may be found guilty under section 1505 if the prosecution establishes that 1) there was a proceeding pending before a department or agency of the United States; 2) the defendant knew of or had a reasonably founded belief that the proceeding was pending; and 3) the defendant corruptly endeavored to influence, obstruct, or impede the due and proper administration of the law under which the proceeding was pending. Leonard B. Sand et al., 1A Modern Federal Jury Instructions: Criminal ¶ 46.02 (instruction 46–9); see also United States v. Price, 951 F.2d 1028, 1030–31 (9th Cir.1991).

■ Despite the language of count ten, which charges that the knowledge Sprecher concealed in his effort to impede the SEC investigation was material to the investigation, materiality is not an element of obstruction of justice. See United States v. Ruggiero, 934 F.2d 440, 446 (2d Cir.1991). Nor is it a requirement that a defendant succeed in his endeavor to obstruct. See United States v. Russell, 255 U.S. 138, 143, 41 S.Ct. 260, 261, 65 L.Ed. 553 (1921); see also United States v. Fasolino, 586 F.2d 939, 940–41 (2d Cir.1978). Rather, it is sufficient that the defendant has made an "effort or essay to accomplish the evil purpose" outlawed by the statute. United States v. Buffalano, 727 F.2d 50,

53 (2d Cir.1984) (quoting *Russell,* 255 U.S. at 143, 41 S.Ct. at 261).

 While the statutory term "corruptly endeavors" requires intent, such intent may be inferred from proof that the defendant knew that his corrupt actions would obstruct justice then actually being administered. *Id.* at 54 (discussing similar provision for obstruction of judicial proceedings, 18 U.S.C. § 1503). "Corruptly" simply means to be motivated by an improper purpose. *See Fasolino,* 586 F.2d at 941 (2d Cir.1978).

The nature of Sprecher's involvement with KKP was one of the subjects of the SEC investigation that was pending in May 1985 pursuant to which Sprecher was called to testify. When Sprecher made the false statements which sought to minimize his role with respect to KKP, his clearly corrupt purpose was to conceal his control of what he wished to portray as a legitimate, tax-exempt religious corporation and thereby hamper the SEC's investigation.

Therefore, I find Sprecher guilty of obstruction of justice as charged in count ten.

*D. Count Eleven—1989 Obstruction of the SEC's Utah Investigation*

 . In this last count, it is charged that Sprecher knowingly and corruptly attempted to influence, obstruct, and impede the due administration of justice by a federal court in violation of 18 U.S.C. § 1503 by deliberately concealing his true knowledge concerning matters involving KKP and NAV–AIR that were material to an SEC investigation. The basis for count eleven is Sprecher's statement in the affidavit filed in the district court in Utah that his sole relationship with KKP and NAV–AIR was that of attorney-client.

 Section 1503 provides that

[w]hoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States ... or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

To show a violation of 18 U.S.C. § 1503, the Government must establish that: 1) a federal judicial proceeding was pending; 2) the defendant knew of or had a reasonably founded belief that the proceeding was pending; and 3) the defendant corruptly endeavored to influence, obstruct, or impede the proceeding. *See United States v. Capo,* 791 F.2d 1054, 1070 (2d Cir.1986), *rev'd in part on rehearing en banc on other grounds,* 817 F.2d 947 (2d Cir.1987); 1A Sand et al., *supra,* ¶ 46.01 (instruction 46–3). The standards for a finding of obstruction of justice are outlined in the discussion above of section 1505.

In his Utah litigation, Sprecher sued to quash SEC subpoenas that called for the production of the bank records of KKP and NAV–AIR. He intended that the court rely on the false representation in his affidavit and that the misrepresentation would persuade the court to thwart the SEC investigation. Thus, in making the false statement and causing it to be filed in the Utah district court, he was endeavoring improperly to influence the outcome of the litigation in his favor. I find the defendant guilty of obstruction of justice as charged in count eleven.

### CONCLUSION

The foregoing shall constitute my findings of fact, conclusions of law, and the verdict of the court. I find the defendant guilty of the crimes charged in counts one through seven and nine through eleven of the indictment.